**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

DYTREL JACKSON, MADELINE JACKSON, RYAN
OWUSU, MARCUS SWEAT, and REGINALD
WAKEFIELD,

                            Plaintiffs,

     -against-

THE CITY OF NEW YORK, a municipal entity;
NYPD Police Officer KRISTI SKEHILL (Shield
#12014), and NYPD Police Officers "JOHN and/or
JANE DOES" Nos. 1, 2, 3, etc. (whose identity are
unknown but who are known to be personnel of the
New York City Police Department), all of whom are
sued individually and in their official capacities.

                            Defendants.

-------------------------------------------------------------------- X

No.  15-cv-4987 (CM)(AJP)

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL**

       Plaintiffs DYTREL JACKSON, MADELINE JACKSON, RYAN OWUSU, MARCUS

SWEAT, and REGINALD WAKEFIELD ("PLAINTIFFS"), by their attorneys, Beldock Levine

& Hoffman LLP, as and for their complaint against the defendants named above allege as

follows:

## PRELIMINARY STATEMENT

       1.     This civil rights action seeks redress under 42 U.S.C. § 1983 and New York State

law for injuries PLAINTIFFS sustained from the unconstitutional conduct of defendants THE

CITY OF NEW YORK ("CITY") and New York City Police Department ("NYPD") Police

Officer KRISTI SKEHILL (Shield #12014) and police officers "JOHN and/or DOES" Nos. 1, 2,

3, etc.

       2.     On June 27, 2014, PLAINTIFFS were at the Bronx, New York, home of

MADELINE JACKSON when defendant police officers, in the absence of exigent circumstances

and without permission or a search warrant, entered and accosted them.  PLAINTIFFS were variously punched, kicked, thrown on the ground, handcuffed, and dragged out of the apartment by the defendant police officers.  PLAINTIFFS were then taken to the 46th Precinct where defendant police officers continued to physically and verbally assault them.  PLAINTIFFS were baselessly charged with Obstructing Governmental Administration and transferred to Bronx Central Booking.  PLAINTIFFS were eventually released from Bronx Central Booking after the Bronx District Attorney's Office declined to prosecute the defendant police officers' baseless charges against them.

3.      PLAINTIFFS seek (i) compensatory damages for loss of liberty, physical injury, psychological and emotional distress, and other injuries caused by the illegal actions of the defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including costs and attorney's fees, as this Court deems equitable and just.

## JURISDICTION

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of PLAINTIFFS' constitutional and civil rights.

5.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state constitutional and common law claims that are so related to the federal claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

6.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to PLAINTIFFS' claims took place.

## JURY DEMAND

7.      PLAINTIFFS demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

## THE PARTIES

8.      Plaintiff DYTREL JACKSON ("DYTREL") is an African-American citizen of the United States and is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

9.      Plaintiff MADELINE JACKSON ("MS. JACKSON") is an African-American citizen of the United States and is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

10.     Plaintiff RYAN OWUSU ("RYAN") is an African-American citizen of the United States and is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

11.     Plaintiff MARCUS SWEAT ("MARCUS") is an African-American citizen of the United States and is and was at all times relevant to this complaint a resident of New York County, City and State of New York.

12.     Plaintiff REGINALD WAKEFIELD ("REGINALD") is an African-American citizen of the United States and is and was at all times relevant to this complaint a resident of Bronx County, City and State of New York.

13.    Defendant CITY is a municipal entity created and authorized under the laws of the State of New York.   It is authorized by law to maintain a police department and does maintain the NYPD which acts as its agent in the area of law enforcement and for which it is ultimately responsible.   The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers.

14.    Upon information and belief, defendant KRISTI SKEHILL ("SKEHILL") was and is a citizen of the United States and the State of New York and was and is employed by the NYPD as a Police Officer under Shield #12014.

15.    Upon information and belief, defendants "JOHN and/or JANE DOES" Nos. 1, 2, 3, etc., ("DOES") were and are citizens of the United States and the State of New York and were and are employed by the NYPD.

16.    At all times relevant herein, defendant police officers SKEHILL and DOES acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the CITY and/or the NYPD, and incidental to the lawful pursuit of their duties as agents, employees, and/or officers of the CITY and/or the NYPD.

17.    At all times relevant herein, defendant police officers SKEHILL and DOES violated clearly established rights and standards under the Fourth and Fourteenth Amendments to the United States Constitution and equivalent New York State constitutional provisions, of which reasonable police officers in their circumstances would have known.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

18.     DYTREL, MARCUS, RYAN, and MS. JACKSON each personally served Notices of Claim upon the CITY on August 22, 2014, within ninety (90) days of the events giving rise to their claims.

19.     More than thirty (30) days have elapsed since DYTREL, MARCUS, RYAN, and MS. JACKSON served their Notices of Claim and the CITY has not offered adjustment or payment thereof.

20.     REGINALD personally served a Notice of Claim upon the CITY on October 23, 2014, within ninety (90) days of the events giving rise to his claim

21.     More than thirty (30) days have elapsed since REGINALD served his Notice of Claim and the CITY has not offered adjustment or payment thereof.

22.     This action is filed within one year of the events giving rise to PLAINTIFFS' claims.

## STATEMENT OF FACTS

23.     On the evening of July 27, 2014, MARCUS, RYAN, and REGINALD, along with Derrick Johnson, met their friend DYTREL at the apartment where he lived with his mother, MS. JACKSON, at 31 West Tremont, Apartment #2E, Bronx, New York, to socialize, play cards, listen to music, and eat dinner.

24.     At approximately 10:30 p.m., DYTREL, RYAN, MARCUS, REGINALD, and Derrick left MS. JACKSON's apartment to go to a bodega next door.

25.     At that time, MS. JACKSON was sleeping in her bedroom.

26.     DYTREL, REGINALD, and Derrick went into the bodega, while MARCUS remained outside the bodega listening to music on his headphones and RYAN waited for them at the apartment building entrance and held the door open.

27.     While he was holding the door and waiting for his friends, RYAN heard what sounded like gunshots and saw people running.

28.     MARCUS also saw people running.

29.     When DYTREL, REGINALD, and Derrick came out of the bodega, they also saw people running.

30.     DYTREL, RYAN, MARCUS, REGINALD, and Derrick returned to MS. JACKSON's apartment.

31.     RYAN went to sleep in DYTREL's bedroom, while DYTREL, MARCUS, REGINALD, and Derrick remained in the living room.

32.     At approximately 11:00 p.m., DYTREL, MARCUS, REGINALD, and Derrick heard someone start knocking on the front door.

33.     DYTREL and REGINALD went to the door and took turns looking through the peep-hole, but could not see who was outside the door.

34.     DYTREL thought whoever was banging on the door was purposefully hiding themselves from being seen through the peephole, so he did not open the door.

35.     The banging continued for a short while and then stopped.

36.     About a half hour later, DYTREL, MARCUS, and Derrick heard someone again start banging on the apartment door.

37.     At that time, REGINALD was in the bathroom and RYAN was still sleeping in DYTREL's room.

38.     The banging was louder and more intense than it had been earlier.

39.     DYTREL, MARCUS, and Derrick discussed what they should do.

40.     Someone on the other side of the apartment door yelled, in sum and substance, "NYPD – police, open up!"

41.     DYTREL, MARCUS, and Derrick then heard what sounded like a power saw cutting into metal and saw the door start vibrating violently.

42.     DYTREL went to MS. JACKSON's bedroom and woke her up.

43.     DYTREL told MS. JACKSON that someone claiming to be the police was at the front door trying to break in.

44.     MS. JACKSON, who was wearing her pajamas at the time, went to the front door.

45.     MS. JACKSON tried to open the door, but was prevented from doing so by what felt like someone holding the door shut from the other side.

46.     The force holding the door shut suddenly ceased and the front door was flung open.

47.     Several police officers, including defendants SKEHILL and DOES, rushed into the apartment yelling, in sum and substance, "Get on the floor!" and "You're under arrest!"

48.     The police officers were wearing body armor.

49.     Police officers brandished shields and pointed automatic weapons at PLAINTIFFS.

50.     Police officers violently grabbed MS. JACKSON and pulled her out of her apartment while pointing guns at her head.

51.     The police officers then forced MS. JACKSON against the door and handcuffed her.

52.     DYTREL, who was standing near the front door, was punched in the face by a police officer.

53.     Police officers then forced DYTREL to the ground and put handcuffs on him.

54.     The police officers then dragged DYTREL out of the apartment and into the hallway.

55.     MARCUS was sitting on the couch and putting on his sneakers when the police rushed in.

56.     Police officers violently grabbed MARCUS and threw him face first on to the floor.

57.     Police officers then placed MARCUS in handcuffs and left him lying on the floor.

58.     While MARCUS was lying on the floor, a police officer in plain clothes walked up to him, kicked him in the mouth, and asked him, in sum and substance, if he thought he was "slick."

59.     MARCUS asked the police officer what he meant.

60.     The police officer responded by kicking MARCUS in the mouth again.

61.     REGINALD, who was in the bathroom sitting on the toilet, heard yelling and other loud noises coming from outside.

62.     The bathroom door burst open and police officers wearing body armor and brandishing shields and automatic guns rushed in.

63.     REGINALD was violently pulled off of the toilet and thrown on the ground.

64.     The police officers put handcuffs on REGINALD.

65.     REGINALD was then dragged out of the bathroom with his underwear and pants down, around his ankles.

66.    REGINALD asked the police officers why they were attacking him and his friends.

67.    None of the police officers responded to REGINALD's question.

68.    RYAN was awoken by all of the noise the police were making.

69.    RYAN heard police officers yelling at him to come out with his hands up.

70.    RYAN got out of DYTREL's bed and walked towards the hallway with his hands up.

71.    RYAN was only wearing jeans.

72.    As soon as RYAN reached the hallway, a police officer in body armor grabbed RYAN, placed him in a choke hold, forced him to the ground, and dragged him to the hallway outside of the apartment while still in a choke hold.

73.    The police officer released RYAN from the chokehold and yelled at him to get up.

74.    As RYAN stood up, he asked the police officer why they were attacking them.

75.    A police officer responded, in sum and substance, "You know what you did."

76.    A police officer then placed RYAN in handcuffs.

77.    Once he had put RYAN in handcuffs, the police officer violently jerked RYAN's arms upward from behind his back, causing him great pain.

78.    The police officers searched PLAINTIFFS and did not find any evidence of illegality.

79.    Police officers told PLAINTIFFS that they were going to search the apartment and that they should tell the police if there was anything illegal therein.

80.    PLAINTIFFS responded that there was nothing illegal in the apartment.

81.     The police officers never told any of the PLAINTIFFS that they had a search warrant to enter and search MS. JACKSON's apartment.

82.     PLAINTIFFS were eventually taken out of the apartment building, still in handcuffs, and placed in police vehicles.

83.     REGINALD's underwear and pants were still down around his ankles when he was taken out of the apartment building and placed in a police vehicle.

84.     REGINALD attempted to pull his underwear and pants up to cover himself, but was unable to do so because he was handcuffed.

85.     The police officers neither helped, nor offered to help, REGINALD get his underwear and pants up.

86.     RYAN was only wearing jeans when he was taken out of the apartment and placed in the police vehicle.

87.     MS. JACKSON was only wearing her pajamas when she was taken out of her apartment and placed in the police vehicle.

88.     Upon information and belief, a security camera located in the hallway directly outside of the front door of MS. JACKSON's apartment was physically disabled by police officers when they arrived at the Jackson's apartment on the night of July 27, 2014.

89.     Upon information and belief, that camera would have captured the events in and about the entrance to the Jackson's apartment had the police officers not disabled it.

90.     Upon information and belief, police officers searched MS. JACKSON's apartment after PLAINTIFFS had been taken outside.

91.     During the search, police officers caused unnecessary, unjustified and excessive damage to MS. JACKSON's apartment, including, *inter alia*, scattering the contents of the

apartment all over the place, breaking the frame of MS JACKSON's box spring bed, tearing her mattresses apart, smashing hanging plants and dishes that had been hanging on the wall, destroying DYTREL's, RYAN's, and REGINALD's cell phones by placing them in the water tank of MS. JACKSON's toilet, and smashing the lid to MS. JACKSON's toilet.

92.     Upon information and belief, the police officers did not find any evidence of illegality in MS. JACKSON's apartment.

93.     The police officers transported PLAINTIFFS to the 46th Precinct.

94.     While PLAINTIFFS were being transported to the 46th Precinct, REGINALD told the police officers that they had rights and that what the police officers were doing to them was wrong.

95.     REGINALD further told the police officers that he was going to complain about their conduct to the Civilian Complaint Review Board once he was released.

96.     At the 46th Precinct, PLAINTIFFS were brought before a desk sergeant.

97.     The desk sergeant ordered one of the other police officers to get REGINALD's pants and underwear up.

98.     A police officer complied with the desk sergeant's order.

99.     At the 46th Precinct, REGINALD continued to complain about how the police officers were treating him and his friends.

100.    A police officer responded by punching REGINALD in the stomach so hard that he threw up.

101.    When he recovered from being punched and throwing up, REGINALD asked the police officer why he punched him.

11

102.     The police officer responded, in sum and substance, that he punched REGINALD because REGINALD was doing the most talking.

103.     Reginald was then separated from his friends and placed in a holding cell.

104.     After seeing the desk sergeant, police officers took RYAN to a bathroom and told him to remove all his clothes.

105.     The police officers threatened that they would lay hands on RYAN if he did not comply with their orders.

106.     RYAN, who did not want to suffer further violence by the police officers, complied with their orders.

107.     RYAN was then subjected to a strip search by the police officers.

108.     When RYAN had removed all of his clothes, the police officers ordered him to squat and move from side to side.

109.     When the police officers had completed the strip search, RYAN was placed in a holding cell.

110.     Police officers also took DYTREL to a bathroom and told him to remove all of his clothes.

111.     When DYTREL questioned their directions, police officers violently pushed him against a wall and threatened that they would make him remove his clothes if he did not comply with their orders.

112.     DYTREL was then subjected to a strip search.

113.     When DYTREL had removed all of his clothes, the police officers told DYTREL to turn around.

114.     DYTREL told the police officers that he was not physically able to turn.

12

115.   The police officers responded by telling DYTREL that it was not his turn to talk.

116.   The police officers then punched DYTREL several times, and violently forced his head into the wall.

117.   The police then ordered DYTREL to squat and to move from side to side.

118.   The police officers completed their strip search of DYTREL and placed him in a holding cell.

119.   Police officers also took MARCUS to a bathroom and told him to remove all of his clothes.

120.   When MARCUS refused to remove his clothes, police officers attempted to physically remove MARCUS's clothes.

121.   MARCUS attempted to prevent the police officers from removing his clothes by moving from side to side.

122.   One of the police officers began slapping MARCUS in the face.

123.   MARCUS attempted to protect his face from being hit by burying it in the chest of the police officer in front of him.

124.   Approximately four or five police officers then began punching and hitting MARCUS.

125.   The police officers lifted MARCUS into the air, brought him to the holding cell in which DYTREL had been placed, and threw him into the cell.

126.   The police officers continued to punch and hit MARCUS after they had thrown him into the holding cell.

127.   Police officers kicked MARCUS in his stomach and punched him in his sides, in his ribs, and in his back.

128.    MARCUS was also hit in the head with a hard object that he thought was a walkie-talkie.

129.    MARCUS was eventually put in a choke hold by one of the police officers.

130.    While the police officers were kicking, punching, and hitting MARCUS, DYTREL asked the police officers why they were beating him up and asked them to stop.

131.    A police officer responded to DYTREL by shooting him in the back with a Taser electroshock weapon.

132.    The Taser caused DYTREL's muscles to contract and he collapsed to the ground in great pain.

133.    The police officer then shot DYTREL again in the back with the Taser electroshock weapon.

134.    REGINALD, who had been placed in a separate holding cell, heard his friends yelling and screaming in pain.

135.    Eventually, a police officer asked REGINALD if he wanted to use the bathroom.

136.    Reginald responded that he did.

137.    The police officers took Reginald to a bathroom.

138.    When they arrived at the bathroom, the police officers asked REGINALD to remove all of his clothes.

139.    The police officers threatened that they would lay hands on REGINALD if he did not comply with their orders.

140.    REGINALD complied with the police officers orders.

141.    REGINALD was then subjected to a strip search by the police officers.

142.    When REGINALD had removed all of his clothes, the police officers ordered him to squat and move from side to side.

143.    PLAINTIFFS were held in holding cells at the 46th Precinct for many hours

144.    While in a holding cell, MARCUS and DYTREL were visited by what they thought was an Emergency Medical Services ("EMS") worker.

145.    The supposed EMS worker asked them if anything was wrong with them.

146.    MARCUS responded by telling the supposed EMS worker where he hurt and stating that he wanted to go to the hospital.

147.    The supposed EMS worker did not follow up on MARCUS's complaints by examining him or providing any medical care.

148.    The supposed EMS worker instead started questioning MARCUS about why he was being held at the precinct and whether he knew anything about a shooting that had taken place earlier that night.

149.    MARCUS told the supposed EMS worker that he did not know what he was talking about.

150.    MARCUS again asked to be taken to the hospital for medical attention.

151.    Police officers responded by telling MARCUS that if he went to the hospital, he would be held in custody for a much longer period of time.

152.    MARCUS did not want to be held in custody for a much longer period by the police officers who had beaten him up and withdrew his request.

153.    Eventually, PLAINTIFFS were individually taken from the holding cell to be interrogated by police officers at the 46th precinct.

154.    During these interrogations, PLAINTIFFS were asked if they had any information about a shooting and/or any criminal activity in their neighborhood.

155.    PLAINTIFFS did not know anything about a shooting and told the police officers that they had no information to provide.

156.    At some point at the 46th Precinct, PLAINTIFFS were fingerprinted by police officers.

157.    At some point in the 46th Precinct, police officers took a mugshot photograph of MS. JACKSON.

158.    The police officers at the 46th Precinct did not take mugshot photographs of any of PLAINTIFFS DYTREL, RYAN, MARCUS, and REGINALD, all of whom had been punched and beaten.

159.    PLAINTIFFS asked police officers at the 46th Precinct several times why they had been arrested, but were either ignored or told, in sum and substance, "You know what you did."

160.    RYAN repeatedly asked police officers at the 46th Precinct for shoes and a shirt because he still only had on jeans.

161.    At some point in the afternoon of July 28, 2014, PLAINTIFFS were transferred from the 46th precinct to Bronx Central Booking.

162.    Just prior to being transferred to Bronx Central Booking, RYAN was given a shirt to wear that had been taken from DYTREL's closet.

163.    RYAN was still barefoot when he was taken to Bronx Central Booking.

164.    RYAN was eventually given slipper type shoes at Bronx Central Booking.

165.    At some point at Bronx Central Booking, PLAINTIFFS learned that they were being charged with Obstruction of Governmental Administration.

166.    In the early hours of the morning on July 29, 2014, after having spent more than twenty-four (24) hours in custody, DYTREL and RYAN were taken from a holding cell by defendant SKEHILL and told to go with her.

167.    DYTREL and RYAN believed they were going to be able to talk to a lawyer or be brought before a judge.

168.    Instead, defendant SKEHILL took DYTREL and RYAN to a side door exit at Bronx Central Booking and told them to go home.

169.    In the early hours of the morning on July 29, 2014, after having spent more than twenty-four (24) hours in custody, defendant SKEHILL took MARCUS and also released him from a side door of Bronx Central Booking without MARCUS having seen an attorney or a judge.

170.    In the early hours of the morning on July 29, 2014, after having spent more than twenty-four (24) hours in custody, defendant SKEHILL and another male officer called REGINALD from the cell where he was being held at Bronx Central Booking.

171.    The male police officer put handcuffs on REGINALD as they were taking him out of the cell.

172.    REGINALD complained to the officer that the handcuffs were too tight and that he thought his wrist was broken.

173.    The male police officer responded by making the handcuffs even tighter.

174.    REGINALD was eventually released with MS. JACKSON from a side door of Bronx Central Booking without either of them having seen an attorney or a judge.

175.    Upon information and belief, the Bronx County District Attorney's Office declined to prosecute the baseless charges against PLAINTIFFS.

176.    After being released, MS. JACKSON and DYTREL returned to their apartment accompanied by MARCUS who needed to retrieve some of his belongings that he had left there.

177.    When MS. JACKSON, DYTREL, and MARCUS returned to MS. JACKSON's apartment, they found that it had been ransacked.

178.    MARCUS was unable to find his belongings that he had left there, which included his cell phone.

179.    PLAINTIFFS had not been engaged in any activities that were in violation of any law during the events described above and defendants had no probable cause to arrest them.

180.    At all times relevant herein, the individual defendant police officers were engaged in a joint venture.  The individual police officers assisted each other in performing the various actions described and lent their physical presence and the support and the authority of their office to each other during the said events.

181.    Defendants' conduct caused PLAINTIFFS to suffer loss of liberty, physical injury, emotional and psychological pain, embarrassment, humiliation, harm to their reputations, and deprivation of their constitutional rights.

### FIRST CAUSE OF ACTION
**42 U.S.C. § 1983 – Violations of Fourth and Fourteenth Amendment Rights**
**(Against Individual Defendants)**

182.    PLAINTIFFS reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

183.    In committing the acts and omissions complained of herein, defendants acted under color of state law to deprive PLAINTIFFS of certain constitutionally protected rights under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to:

a.   the right to be free from unreasonable search and seizure of their persons;

b.   the right to be free from excessive force;

c.   the right to be free from arrest without probable cause;

d.   the right to be free from false imprisonment, that being wrongful detention without good faith, reasonable suspicion, or legal justification, of which detention PLAINTIFFS were aware and to which they did not consent;

e.   the right to be free from the lodging of false criminal charges against them by police officers, including on information and belief, by some or all of the Individual Defendants;

f.   the right to be free from malicious prosecution by police officers, that being prosecution without probable cause instituted with malice and ultimately terminated in PLAINTIFFS' favor; and

g.   the right to be free from deprivation of liberty without due process of law.

184.   In committing the acts and omissions complained of herein, defendants SKEHILL and DOES breached their affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

185.   As a direct and proximate result of defendants SKEHILL's and DOES' deprivation of PLAINTIFFS' constitutional rights, PLAINTIFFS suffered the injuries and damages set forth above.

186.   The unlawful conduct of defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION
### Violations of the New York State Constitution
### (Against all Defendants)

187.   PLAINTIFFS reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

188.     Such conduct breached the protections guaranteed to PLAINTIFFS by the New

York State Constitution including, but not limited to, Article I, Secs. 6 and 12, and including the

following rights:

    a.  the right to be free from unreasonable search and seizure of their persons;

    b.  the right to be free from excessive force;

    c.  the right to be free from arrest without probable cause;

    d.  the right to be free from false imprisonment, that being wrongful detention without good faith, reasonable suspicion, or legal justification, of which detention PLAINTIFFS were aware and to which they did not consent;

    e.  the right to be free from the lodging of false criminal charges against them by police officers, including on information and belief, by some or all of the Individual Defendants;

    f.  the right to be free from malicious prosecution by police officers, that being prosecution without probable cause instituted with malice and ultimately terminated in PLAINTIFFS' favor; and

    g.  the right to be free from deprivation of liberty without due process of law.

189.     The deprivation of PLAINTIFFS' rights under the New York State Constitution

resulted in the injuries and damages set forth above.

### THIRD CAUSE OF ACTION
**Assault and Battery**
**(Against all Defendants)**

190.     PLAINTIFFS reallege and incorporate by reference the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

191.     Defendants SKEHILL and DOES, without just cause, wilfully and maliciously

used physical force against PLAINTIFFS causing them injuries.

192.    Defendants SKEHILL and DOES committed the foregoing acts intentionally, wilfully, and with malicious disregard for PLAINTIFFS' rights, and are therefore liable for punitive damages.

**FOURTH CAUSE OF ACTION**
**False Imprisonment**
**(Against all Defendants)**

193.    PLAINTIFFS reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

194.    Defendants SKEHILL and DOES, through the foregoing acts, caused PLAINTIFFS to be wrongfully detained without good faith, reasonable suspicion, or legal justification, of which detention PLAINTIFFS were aware and to which they did not consent.

195.    Defendants SKEHILL and DOES committed the foregoing acts intentionally, willfully, and with malicious disregard for PLAINTIFF's rights and are therefore liable for punitive damages.

**FIFTH CAUSE OF ACTION**
**Malicious Prosecution**
**(Against all Defendants)**

196.    PLAINTIFFS reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

197.    Defendants SKEHILL and DOES, through the foregoing acts, maliciously commenced a criminal proceeding against PLAINTIFFS, which ended in their favor, without probable cause to believe PLAINTIFFS were guilty of the crimes charged or any crimes.

198.    Defendants SKEHILL and DOES committed the foregoing acts intentionally, willfully, and maliciously, and are therefore liable for punitive damages.

## SIXTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against all Defendants)

199.    PLAINTIFFS reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

200.    Defendants SKEHILL and DOES, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused PLAINTIFFS to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

201.    Defendants SKEHILL and DOES committed the foregoing acts intentionally, willfully, and with malicious disregard for PLAINTIFFS' rights and are therefore liable for punitive damages.

## SEVENTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
### (Against all Defendants)

202.    PLAINTIFFS reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

203.    As police officers acting in the performance of their duties, defendants SKEHILL and DOES owed PLAINTIFFS a duty of care.

204.    In breach of that duty, defendants SKEHILL's and DOES' foregoing conduct endangered PLAINTIFFS' safety and caused them to fear for their safety.

205.    As a result, PLAINTIFFS suffered emotional distress.

## EIGHTH CAUSE OF ACTION
### Negligence
### (Against the City)

206.     PLAINTIFFS reallege and incorporate by reference the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

207.     Defendant CITY, by its aforementioned acts, negligently failed to use care in the

performance of its duties in that it, among other acts:

a.  Hired and retained incompetent and unfit police officers whom it knew or
    should have known engaged in making arrests without probable cause; broke
    into, entered, and destructively searched private residences without a warrant
    or exigent circumstances; and who possessed dangerous propensities and a
    lack of proper temperament;

b.  Failed to exercise care in instructing police officers, officials, supervisors, and
    civilian employees as to their deportment, behavior, and conduct, including
    but not limited to failing to give proper instruction and training ("training"
    hereafter) as to making arrests only where there was probable cause for the
    arrest; failing to give proper training as to breaking, entering, and searching a
    private residence only with a valid search warrant or exigent circumstances;
    failing to give proper training as to using force in the course of police pursuits;
    and failing to give proper training concerning the obligation of police officers
    to intervene to protect citizens threatened with violence or deprived of
    constitutional rights by other New York City police officers.

c.  Failed to supervise and discipline police officers, officials, supervisors, and
    civilian employees whom it knew or should have known engaged in making
    arrests without probable cause; broke into, entered, and destructively searched
    private residences without a search warrant of under exigent circumstances;
    engaged in the use of excessive force; and who failed to intervene to protect
    citizens threatened with violence or deprived of constitutional rights by other
    New York City police officers.

208.     All of these acts were performed without any negligence on the part of

PLAINTIFFS and were the proximate cause of PLAINTIFFS' injuries.

## NINTH CAUSE OF ACTION
### *Respondeat Superior*
### (Against the City)

209.    PLAINTIFFS reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

210.    At all relevant times, defendants SKEHILL and DOES were employees of the City and were acting within the scope of their employment.

211.    The CITY is therefore vicariously liable under the common law doctrine of *respondeat superior* for the actions of defendants SKEHILL and DOES set forth herein.

## DEMAND FOR RELIEF

**WHEREFORE**, PLAINTIFFS demand the following relief against the defendants, jointly and severally:

(a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

(b)    punitive damages from defendants SKEHILL and DOES to the extent allowable by law;

(c)    attorney's fees;

(d)    the costs and disbursements of this action;

(e)    interest; and

(f)    such other and further relief as this Court deems just and proper.

Dated: New York, New York          BELDOCK LEVINE & HOFFMAN LLP
       October 28, 2015            99 Park Avenue, Suite 2600
                                   New York, New York 10016
                                   (212) 490-0400
                                           /s/Marc A. Cannan
                                   Myron Beldock
                                   Marc A. Cannan
                                   *Attorneys for Plaintiffs Dytrel Jackson, Madeline Jackson, Ryan Owusu, Marcus Sweat, and Reginald Wakefield*